Per Curiam.

The bill of exceptions was tendered in seagofi, as to any exception to the charge of the judge, but it was not ten- ' dered in season as to any question of evidence arising upon the trial; for the party, if the exception had been made at the time, •might have waived or supplied the evidence. (Wright v. Sharp, 1 Salk. 288. Jones v. Ins. Co. of N. Am. 4 Dallas, 249.)
The bill of exceptions was amended according to this opinion of the court.
*327 Again, the plaintiff considered the order contained in the de» fendant’s letter of the 9th January as completely abrogated. From the 13th February to the 24th July the defendant sent but one letter to the plaintiff, and that one of no importance. He had wholly disappeared from the contract. The principals alone appear, and there is a long chain of correspondence between them.
Again, the plaintiff promises to keep the defendant duly ad» vised of all proceedings, yet he never did advise the defendant of the two bills in question, amounting to 10,000 dollars, drawn direct on Taber & Son. By neglecting to keep the defendant advised of the bills, the plaintiff lost, according to the principles of commercial law, his right to have recourse to Barker, in case of the failure of Taber ¿¡- Son. By this neglect, the plaintiff must be considered as having waived all right to call on the defendant.
Pendleton, contra, insisted,
that there was an original, positive and substantive engagement on the part of the defendant, that all bills drawn by the plaintiff, on account of the Mac, should be paid, whether those bills were drawn on the defendant or on Taber 8r Son. The letter of the 13th oí February, 1806, contains this contract, and if it was not revoked, or changed, by any new agreement between the parties, there can be no doubt of the liability of the defendant.
Then, was there any such new agreement? The defence rests on the validity of the position, that there was a new agreement substituted in the place of the first engagement. All written documents relative to one subject matter, must be construed, together as one instrument. This was a mercantile transaction; and the whole correspondence between the parties is to be taken together as forming one contract; and where the latter part is in - consistent with, or contradictory to, the former, it must so far revoke or modify the preceding matter. Such transactions are usually carried on by letters, and this rule is, therefore, peculiarly applicable to them. Another principle of construction is also to be observed in relation to such contracts. They are to be so construed as to be rendered definite and certain. Certainty is of the highest importance in all commercial transactions, especially in matters of agency. Any ambiguity ought not to be turned *328 against the agent, but he should be held to a strict observance of instructions. To establish a departure from the original in- ' stractions, there should be either an express revocation of them, or a subsequent order, or act, inconsistent with such original instructions. Now, it is not pretended, in the present case, that there was any express revocation of the former instructions: nor is there any inconsistency or contradiction in saying, on the 9th of January, “ I will honour any bills on Taber S' Son, or me,” and on the 13th of February, or 24th of July, “thy bills on me for their account shall meet due honour.” The defendant does not Say “ thy bills on me only,” nor does he use any words negativing what was said in the first letter, as to bills on Taber Sr Son. The drawing of bills on Taber Sr Son, or on Barker, was merely for the sake of greater facility in negotiating a sale of bills,, só as to reimburse the plaintiff for his advances in the purchase of the cotton ordered. Suppose the plaintiff had neglected to execute the orders to purchase cotton, load and despatch the ship, because he could not sell bills on Barker, when he might have sold bills oa Taber S' Son; might not they or the defendant have justly objected to the plaintiff that he was not limited to drawing bills on Barker only, and have held him responsible for a neglect of orders, and a failure of the enterprise ?
It is said that the last orders are always to be observed. True. But there is nothing in the subsequent letters that revokes or varies the plan of the enterprise laid down in the first letter. If the letter of the 24th of July is to be considered as altering or revoking the letter of the 9th of January, then the next letter of the 26th of September, which is wholly silent as to any guaranty whatever, might be considered as revoking all former engagements.
Letters containing orders of this kind, wheré an agent is concerned, are not to be subjected to nice criticism, but ought to be taken in their natural and plain sense. And if that alone is looked for, then, according to the internal and external evidence of the whole transaction between the parties, it is clear that the guaranty contained in the letter of. the 9th of January, was never revoked, hut was continued. Both Taber Sr Soti and the defendant were extremely solicitous that the Mac should be expedited, with all possible speed. Their orders for this purpose, and for the ¡purchase of 500 bales of cotton, were reiterated and urgent; they Sever could have intended, therefore, to diminish the chance ef *329 the agent’s procuring funds, by the sale of bills, especially when he frequently expressed the great difficulty of placing bills.
There is a fallacy in the argument of the defendant’s counsel, in confounding orders and instructions given to govern the con-duet of an agent, with a contract of guaranty or suretyship. The defendant was a surety cr guaranty so far as regarded Taber S' Son, but in respect to the plaintiff, both Taber S' Son and the defendant were principals, and the plaintiff their agent,
Kent, Ch. J.
delivered the opinion of the court. It is evident from every part of this case, that the defendant was merely an agent and surety for Taber St Son, and that the plaintiff, at the time of the creation of the debt in question, knew of this fact, and that the debt arose on their account, and for their benefit, and not on the account, or for the benefit, of the defendant. He is, therefore, not to be charged beyond his positive obligations by contract.
The claim upon the defendant for the payment of the two bills of the 20th of March, 1807, is founded on his letter of the 9th of January, 1806, in which he stated that the ship Mac was gone to New Orleans, in pursuit of freight, and that he wished her loaded on owners’ account to 500 bales of cotton, and that for the payment of all shipments on owners’ account, the bills of the plaintiff on Taber St Son, or on him, at 60 days’ sight, would meet with due honour.
If there had been no other letter than this, and the plaintiff had acted upon it with reasonable diligence, the defendant would have been responsible for bills drawn upon Taber S' Son. But the defendant, in his letter of the 13th of February, 1806, enclosed one to the plaintiff from Taber 8' Son, in which they assume the character of owners and principals in the transaction, and give directions accordingly, and instruct the plaintiff to draw on them, or on the defendant, or on the house of Rathbone, Hughes S' Duncan, at Liverpool; and the defendant, at the same time, instructs the plaintiff, that his bills on him, the defendant, for account of Taber S' Son, for the cotton they may order to be shipped, shall be duly honoured. The defendant writes again, to the same effect, by his letter of the 24th of July, 1806. These letters were all received before the shipment was made, or the cotton purchased; and it was upon the credit of those letters, and in obedience to the instructions of Taber S' Son, and of their agent, as contained therein, *330 that the shipment was made. This appears evident from the plaintiff’s letter to the defendant of the 26th of September, 1806, and of the 22d of January, 1807.
When Taber Sc Son were introduced to the plaintiff, as owners of the ship, and exclusively interested in the adventure, he immediately and steadily acknowledged them as such, and promised to obey their orders. This appears by his letters of the 27th of March, the 7th of April, and the 5th of June, 1806, all of which were addressed to Taber St Son. And in all his subsequent correspondence he looks up to Taber Sc Son as his principals, on whose account, and under whose orders he acted, and the defendant was considered as an agent merely, who had assumed to pay the drafts on himself. This interference of Taber St Son, as principals, and this recognition of them as such by the plaintiff; this new and specified responsibility of the defendant, and the continued evidence of the plaintiff’s assent to the new arrangement, and the creation of the debt in question, long after had taken place, appear to me to be sufficient to prove that the defendant was not holden beyond the terms of his letters of 13th February and 24th July, 1806, and, consequently, that he was not bound to answer for any bills not drawn directly upon himself.
There was a variation, by the assent of all concerned, in the terms of the engagement contained in the letter of the 9th of January, 1806, and it would be contrary not only to the understanding of the parties, but to the principles upon which the rights of a surety rest, to revive and apply to this case the antecedent engagement of the defendant. That engagement was made before Taber Sc Son had introduced themselves to the plaintiff, and under circumstances which afterwards ceased, to exist. It was modified and merged in the new contract, which arose in consequence of Taber Sc Son making themselves known, and taking a direct and controlling part in the business, as owners. They declare that the defendant was their agent, whose instructions the plaintiff was to follow, and they prescribe the mode of reimbursement, to which the defendant assents as far as depends upon him, The plaintiff also assumes these new propositions as the basis of his conduct, and of the credit he was to give. He acknowledges his obligations to Taber S' Son for their confidence; he promises to execute their orders and follow their instructions; he informs them why he shall, from time to •time, elect one mode of reimbursement offered to him, in pre» *331 ference to the other, and why he shall prefer drawing on the defendant, because of his residence in New-York; but he reminds Taber 8? Son to see that his drafts on the defendant are duly honoured; and he sends them a note of his drafts on the defendant, and promises to keep them advised of his proceedings, and should continue to draw as opportunity offered. This he did so late as the 3d of March, 1807. But on the 20th of that month he altered his mode of drawing, and drew the bills in question on Taber 8r Son, and gave no immediate advice thereof to the defendant. He was accordingly not bound to pay these bills, and the subsequent draft upon him so late as the 30th of January, 1809, was clearly without any existing authority. The delay of nearly two years after drawing on Taber # Son, was a waiver of the right to draw for the same debt on the defendant. It was the same, in effect, as giving a new and extended credit to Taber & Son; and it would be destructive to mercantile confidence and safety, and especially to the interests of agents and correspondents, to allow of a valid resort to the surety after such a delay. It may well be presumed that he would in the mean time, be lulled, by a false confidence, that no such unsatisfied debt existed, and be ready to surrender up to his principal all his means of indemnity.
It may appear to be reasonable that a resort to Taber 8r Son0 in the first instance, should not prejudice the claim of the plaintiff on the defendant, as it would appear to be for the benefit, and not to the injury of the defendant, that the first resort should be to his principals. But it is suEcient to observe that the contract was different, and that the surety is only to be held according to the sound interpretation of the terms of his contract. The parties must have had suEcient reasons, in their own view of the subject, for prescribing the mode on which the responsibility of the defendant was to depend; and it would be hazardous to say that there were no good reasons arising out of the complicated concerns of the trade in which the parties were engaged., for confining the defendant’s engagement to the terms prescribed. Courts are not, indeed, to construe so literally the contract, even of a surety, as to defeat the spirit and sense of it; nor, on the other hand, are they to vary and extend the contract, because ' they do not perceive any inconvenience or reasonable objection to the modification assumed. It is suEcient for the surety to reply non Ikec in fiedera veni* There are many cases in which it *332 has been established that a surety is not held, if there be any vari~ atjon from the terms of his contract, however immaterial the variation niay appear to have been in the given case. (Myers v. Edge, 7 Term Rep. 254. Ludlows v. Simond, 2 Caines' Cases in Error, 1. Walsh v. Bailie, 10 Johns. Rep. 180.) Here was an election given to the plaintiff. He was at liberty to draw on Taber Sc Son, or on their sureties at New-York or Liverpool. He elected, for a while, to draw on the defendant; and then he elects to draw on his principal, and gives no notice to the defendant of the drafts, or at least, no notice consistent with his former practice, or with mercantile promptitude and diligence. The defendant was, consequently, discharged by that election, and not holden for the payment of those bills, any more than he would have been holden, if the bills had been drawn on the house in Liverpool.
The court are accordingly of opinion, that the verdict must be set aside, and a new trial awarded with costs to abide the event Of the suit.
Van Ness, J. dissented.
New trial granted.